**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEVIN C. FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-cv-1517 (RLW) |
| | ) | |
| | ) | |
| | ) | |
| CRANSTON MITCHELL | ) | |
| PAROLE COMMISSIONER | ) | |
| UNITED STATES PAROLE COMMISSION | ) | |
| et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MOTION TO DISMISS**

Defendant the United States of America moves for partial dismissal of the tort claims set forth in Count III, pursuant to Federal Rule of Civil Procedure 12(b)(1).  In addition, Defendants Cranston Mitchell, Isaac Fulwood, Saher Khan, Helen Herman, Lori Gobble, Joann Kelley, Jequan Jackson, Jessica Stigall, and Verna Young, through undersigned counsel, move that the claims plaintiff raises against them in their individual capacity be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defendants refer the Court to the attached memorandum of law for the legal arguments on which this motion is based.  A proposed order is filed herewith.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

RUDOLPH CONTRERAS, DC BAR # 434122
Chief, Civil Division

BY:    /s/   *Robin Meriweather*

ROBIN M. MERIWEATHER
DC BAR # 490114
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7198 (202) 514-8780 (fax)
Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEVIN C. FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-cv-1517 (RLW) |
| | ) | |
| | ) | |
| | ) | |
| CRANSTON MITCHELL | ) | |
| PAROLE COMMISSIONER | ) | |
| UNITED STATES PAROLE COMMISSION | ) | |
| et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION AND SUMMARY

This case arises from Plaintiff Kevin Ford's incarceration and placement on supervised release after he repeatedly failed to comply with the terms of his probation.  Ford obtained habeas relief in 2009.  In the habeas proceeding, the warrant on which Ford's 2004 arrest was based, and subsequent warrants, were declared void because Ford's term of supervised release expired shortly before the United State Parole Commission ("USPC") issued a warrant for Ford's arrest as a parole violator.  Ford now sues the United States of America, alleging that his overdetention resulted from the negligent acts or omissions of the Bureau of Prisons ("BOP"), USPC, and Court Services and Offender Supervision Agency ("CSOSA").  Ford also seeks

damages from several USPC Officials[1] and CSOSA employees,[2] alleging that their actions proximately caused a deprivation of his Fourth and Fifth Amendment rights.

The United States of America invokes its sovereign immunity from suit, and seeks dismissal of the tort claims premised on the CSOSA and USPC Defendants' conduct.  The Court lacks jurisdiction to review those claims because they arise out of the torts of false arrest and false imprisonment.  The FTCA preserves the United States' sovereign immunity for those torts, provided that they do not arise from the conduct of federal officials with the power to arrest individuals, conduct searches, or seize evidence.  Neither the USPC nor CSOSA Defendants possess such powers; therefore, no tort claim for false imprisonment or false arrest may lie against the United States for the USPC and CSOSA Defendants' alleged actions.  In addition, the tort claims arising from the USPC Defendants' alleged conduct involve discretionary functions, which also are exempt from the FTCA's waiver of immunity.  For both reasons, the United States seeks the partial dismissal of the tort claims raised in Count III.

The CSOSA Defendants and USPC Defendants seek dismissal of Ford's claims for several independent reasons.  First, the CSOSA Defendants are federal actors who are not subject to suit under Section 1983, whether the Section 1983 claims seek declaratory, injunctive, or monetary relief.  Although the Court has held that the USPC Defendants are Section 1983 state actors for purposes of claims for injunctive relief, they still cannot be sued for *damages* in their individual capacity pursuant to Section 1983.  Therefore, the Section 1983 claims should be dismissed, as Bivens provides the sole mechanism to raise constitutional damages claims against CSOSA and USPC officials.  Second, the Bivens claims against the CSOSA and USPC

---

[1]  The USPC Defendants are Cranston Mitchell, Isaac Fulwood, Helen Herman, Lori Gobble, Joann Kelley, and Jequan Jackson.
[2]  The CSOSA Defendants are Saher Khan, Jessica Stigall, and Verna Young.

Defendants (which Ford pleads in the alternative), should be dismissed, because the existence of a habeas remedy and the Privacy Act foreclose the creation of a <u>Bivens</u> cause of action in these circumstances.  Third, all of the defendants are protected by absolute immunity, because their alleged conduct was quasi-judicial in nature.  Finally, even if absolute immunity did not apply, qualified immunity would shield all of the CSOSA and USPC Defendants from suit, because no reasonable official would have known, under the circumstances alleged, that Ford's 2004 supervised release term expired before February 17, 2004.   It would have been far from apparent to an objectively reasonable official that the February 17, 2004 and subsequent warrants were invalid; therefore, qualified immunity applies.

## <u>BACKGROUND</u>

Kevin C. Ford was sentenced in District of Columbia Superior Court on July 24, 2003 to 1 year imprisonment for attempted distribution of heroin, to be followed by a 3 month supervised release term. He was released from imprisonment on December 17, 2003, and began serving his three months of supervised release. Am. Compl. ¶ 32; Exh. 2.

On February 17, 2004, Defendant Helen Herman requested that a warrant be issued for Ford's arrest, based on Ford's conduct between December 17, 2003 and February 3, 2004.  <u>See</u> Exh. 3; Am. Compl. ¶¶ 34, 46.  The United States Parole Commission ("USPC") issued a warrant on February 17, 2004 for Ford's arrest as a violator of the conditions of supervision; that warrant was signed by Defendant Mitchell.  <u>See</u> Exh. 4, Am. Compl. ¶ 34.  Ford was arrested on that warrant on July 26, 2004.  <u>See</u> Am. Compl. ¶ 34.

Ford accepted an expedited revocation proposal whereby he would serve a new 12 month term of imprisonment, followed by 48 months of supervised release. <u>See</u> Exh. 5; Am. Compl. ¶

34.   Ford was released from the 12 month term on June 29, 2005, to commence the 48 month supervised release term.   <u>See</u> Am. Compl. ¶ 34.

On February 1, 2006, Defendant Jackson requested a warrant, based on Ford's repeated violations of the conditions of supervision.   <u>See</u> Am. Compl. ¶ 65; Exh. 6.   That warrant was signed by Defendant Fulwood, <u>see</u> Exh. 7, and Ford was taken into custody on August 17, 2006. <u>See</u> Exh. 7; Am. Compl. ¶ 35.   Ford accepted an expedited revocation proposal whereby he would serve a new term of imprisonment of 12 months, and 36 months supervised release.   <u>See</u> Exh. 8; Am. Compl. ¶ 35. Ford was released from confinement August 10, 2007 to begin the 36 month supervised release term.   Am. Compl. ¶ 37.

On June 29, 2007, Ford filed a habeas petition, challenging the calculation of his sentence (on the grounds that he did not receive credit for all of the time he had served prior to his incarceration in 2003), and the term of his supervised release. <u>See</u> <u>Ford v. Caulfield</u>, 652 F. Supp.2d 14 (D.D.C. 2009).   The Court concluded that Ford's term of imprisonment expired before he was actually released, and that the three-month term of Ford's supervised release therefore began to run before Ford was actually released.   <u>See</u> <u>id.</u> at 22.   Therefore, the Court granted Ford's habeas petition, concluding that the February 17, 2004 warrant, and the subsequent warrants and periods of incarceration, were void.   <u>See</u> <u>id.</u>

Ford initiated this litigation on September 10, 2010, and amended his complaint February 24, 2011.   The amended complaint raises tort claims against the United States, charging BOP, USPC, and CSOSA employees with negligence.   Ford also sues the two USPC commissioners who signed the warrants (Defendants Mitchell and Fulwood), and several USPC and CSOSA employees (collectively the "USPC and CSOSA Officials") who allegedly took acts that led to the issuance of those warrants.   Ford contends that his detention and supervised release after

4

February 17, 2004 was unconstitutional, and seeks damages from the USPC and CSOSA

Officials in their individual capacity.

## STANDARD OF REVIEW

The United States of America moves for dismissal under Rule 12(b)(1).  Federal Rule of

Civil Procedure 12(b)(1) gives the plaintiff the burden of establishing that the Court has

jurisdiction to review their claim(s).  See Fed. R. Civ. P. 12(b)(1); Public Warehousing Co. KSC

v. Defense Supply Center Philadelphia, 489 F. Supp. 2d 30, 35 (D.D.C. 2007).  The plaintiff

bears the burden of persuasion, and must establish jurisdiction "by a preponderance of the

evidence."  Thompson v. Capitol Police Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations

omitted); see also Vanover v. Hantman, 77 F. Supp.2d 91, 98 (D.D.C. 1999).  To determine the

existence of jurisdiction, a court may look beyond the allegations of the complaint, consider

affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.  See

Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Cook v. Billington,

541 F. Supp. 2d 358, 362 n.3 (D.D.C. 2008).

The CSOSA and USPC Defendants sued in their individual capacities move for dismissal

under Rule 12(b)(6), for failure to state a claim upon which relief can be granted.  Rule 12(b)(6)

requires dismissal if a plaintiff's claims fail as a matter of law, or if the complaint fails to plead

"enough facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly,

127 S. Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to

show that plaintiff can prove no set of facts in support of its claim which would entitle it to

relief).  The Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff

the benefit of all inferences.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624

(D.C. Cir. 1997).

When reviewing a 12(b)(6) motion, the Court may consider documents outside of the pleadings, "so long as [they] are integral to and explicitly relied upon in the complaint."  See Lorenzo v. Rumsfeld, 456 F.Supp.2d 731, 734 (E.D.Va.2006), aff 'd sub nom. Lorenzo v. Gates, No. 06-2332, 225 Fed. Appx. 165 (4th Cir. April 30, 2007) (unpublished). It is also proper to consider documents of which courts may take judicial notice, such as government documents and other public records, when reviewing a 12(b)(6) motion.  See St. Francis Xavier Parochial Sch., 117 F.3d at 624.

Chief Judge Lamberth recently described the standard as follows:

> To survive a motion to dismiss made pursuant to Rule 12(b)(6), a complaint must "plead [ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). In evaluating a Rule 12(b)(6) motion, the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged ." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979) (internal quotation marks omitted). However, factual allegations, even though assumed to be true, must still "be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Moreover, the Court "need not accept inferences drawn by plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994).

United States v. Hewlett-Packard Co., __ F. Supp.2d __, 2011 WL 109570, (D.D.C. Jan. 11, 2011).

## ARGUMENT

**I.   THE COURT LACKS JURISDICTION TO REVIEW THE TORT CLAIMS BASED ON THE USPC DEFENDANTS' AND THE CSOSA DEFENDANTS' ACTIONS, AND THOSE CLAIMS SHOULD BE DISMISSED.**

The FTCA effects a limited waiver of the sovereign immunity of the United States. Under that statute, the United States has consented to suit for damages caused by "the negligent

or wrongful act or omission of any employee of the Government while acting within the scope of

his office or employment, under circumstances where the United States, if a private person,

would be liable to the claimant in accordance with the law of the place where the act or omission

occurred."  28 U.S.C. § 1346(b)(1).  Absent full compliance with the conditions placed upon that

limited waiver of sovereign immunity, courts lack jurisdiction to entertain tort claims against the

United States.  GAF Corp. v. United States, 818 F.2d 901, 904 & n.86 (D.C. Cir. 1987).

The FTCA has several exceptions, two of which are relevant to this case.  First, section

2680(h) of the FTCA, often referred to as the 'intentional tort' exception, bars claims arising out

of false imprisonment and/or false arrest.  Second, the 'discretionary function exception' is a

further bar to the tort claims premised on USPC officials' alleged actions or omissions.

**A.  The Intentional Tort Exception Bars The Tort Claims Premised On CSOSA and USPC Officials' Conduct.**

The FTCA specifies certain torts for which the statute expressly does <u>not</u> waive the

government's sovereign immunity.  Specifically, the FTCA bars "[a]ny claim arising out of

assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel,

slander, misrepresentation, deceit, or interference with contract rights."  28 U.S.C.

§ 2680(h).  When a claim falls within that statutory exception to the FTCA's waiver of sovereign

immunity, as Ford's claims do here, the court lacks subject matter jurisdiction over the case.  See

Bichage v. United States, 2002 U.S. Dist. LEXIS 17604, at *4 (D.D.C. Mar. 30, 2002) ("The

United States retains immunity pursuant to a number of exceptions contained in the FTCA and if

an exception applies, the court has no subject matter jurisdiction.").

Section 2680(h) bars Ford's tort claims.  Ford's claims are premised on a false arrest and

false imprisonment theory, and the fact that he captions his allegations as 'negligence' claims

does not remove them from the scope of the intentional tort exception.  Section 2680(h)

"excludes from coverage 'any claim *arising out of*' any of the enumerated torts." Koch v. United States, 209 F. Supp. 2d 89, 94 (D.D.C. 2002) (emphasis in original).  Thus, any claim "arising out of" a claim of false arrest or false imprisonment is also barred, even if it is not explicitly titled as a "false arrest" or "false imprisonment."  See id.

"[L]itigants may not circumvent the requirements of the FTCA simply by redrafting the cause of action in terms of negligence." Shelton v. United States, 1991 WL 247815, at *1 (D.D.C. Nov. 17, 1991).  If a claim "sound[s] in negligence but stem[s] from" one of the torts enumerated in Section 2680(h), it is excluded from the FTCA's waiver of immunity.  United States v. Shearer, 473 U.S. 52, 55 (1985).  In order to determine whether Ford's negligence claims are excluded by section 2680, the court must examine the actual conduct upon which Ford bases his negligence claims, id.. and "scrutinize the alleged cause of his injury." Kugel v. United States, 947 F.2d 1504, 1506 (D.C. Cir. 1991).  If the conduct at issue and the cause of Ford's injury constitute a tort listed in section 2680, then the court has no jurisdiction to hear the claim.  See Kugel, 947 F.2d at 1507.

Here, Ford's negligence claims arise from conduct properly characterized as false arrests and false imprisonment.  He alleges that CSOSA employees "negligently requested that an arrest warrant be issued" for alleged violations, Am. Compl. ¶¶ 63, 67, and that their actions "caused Mr. Ford to endure a cycle of wrongful detention and supervised release." Id. ¶ 4.  Ford further alleges that USPC employees negligently applied for and signed arrest warrants, signed a certificate of supervised release (which subjected him to an additional period of supervised release), and proposed the expedited revocation of his parole. Id. ¶¶ 78-79, 82-85.  Again, the alleged result of those actions was an unlawful arrest and detention. See id. ¶ 4.  At bottom, Ford contends that CSOSA and USPC employees took acts which caused him to be detained and

arrested for longer than appropriate.  See id. ¶ 43 (alleging that defendants' conduct "caused Mr. Ford to be arrested, imprisoned, and supervised without legal process").  Thus, the alleged injury of which Ford complains is false arrest and false imprisonment.

Snow-Erlin v. United States, 470 F.2d 804 (9th Cir. 2006), is instructive.  In Snow-Erlin, a former prisoner brought an FTCA action against the United States, alleging negligence in miscalculating his release date.  The Court found that the only harm alleged was that the United States kept the former prisoner for 311 days too long.  Id. at 808.  The Court concluded that Snow-Erlin could not "sidestep the FTCA's exclusion of false imprisonment claims by suing for the damage of false imprisonment under the label of negligence."  Id. (citations omitted).  Hence, the Court found that in examining the substance of the complaint, "the gravamen of the complaint [wa]s a claim for false imprisonment."  Id.  Similarly, in this case, the harm alleged by Ford is that as a result of miscalculating the duration of his supervised release and requesting an arrest warrant be issued, he was unlawfully detained.  See Am. Compl. ¶¶ 1, 4-5, 43, 57.  Thus, the gravamen of Ford's tort claims regarding the CSOSA and USPC officials' alleged conduct is false arrest and/or false imprisonment. Consequently, Ford's claims are outside the Court's jurisdiction, and must be dismissed as a matter of law.  See 28 U.S.C. § 2680(h); see also Kugel, 947 F.2d at 1507.

To be sure, a law enforcement proviso to Section 2680 of the FTCA contains an express waiver of sovereign immunity of the United States for certain acts or omissions of investigative or law enforcement officers arising out of any claim of assault or battery.  See 28 U.S.C. § 2680(h) ("Provided, That, with regard to acts or omissions of investigative or law enforcement officers…the provisions of [the FTCA] shall apply to any claim arising, …out of assault, battery…."); Murphy v. United States, 121 F. Supp. 2d 21, 24 (D.D.C. 2000).  But that waiver

does not confer jurisdiction over Ford's tort claims regarding the USPC and CSOSA conduct, because neither the USPC nor CSOSA defendants meet the FTCA's definition of a "law enforcement" or "investigative" officer.

USPC Commissioners and officers are not "law enforcement" or "investigative" officers within the meaning of Section 2680(h).  The FTCA defines an investigative or law enforcement officer as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrest for violations of Federal Law."  28 USC. § 2680(h).  Parole officers do not have the power to make arrests.  Instead, parole officers may request the issuance of a warrant, and parole commissioners may issue those warrants.  See 28 C.F.R. § 2.44.   The warrants may then be executed, i.e. by arresting the parolee, by officers of federal correctional institutions or other federal officers with the authority to serve criminal process.  See id. § 2.46.  Thus, as the Second Circuit has recognized, "parole officers lack arrest powers that would qualify them as investigative or law enforcement officers under the FTCA."  Wilson v. United States, 959 F.2d 12, 15 (2d Cir. 1992).  Parole officers also lack the authority to conduct searches or seize evidence.  Certain types of parole officers --- who have direct contact with parolees and effectively function as probation officers --- have limited powers to confiscate contraband seen in plain view during a parole visit, which is contingent upon receiving the parolees' permission. See 28 C.F.R. §§ 2.40(a)(1), 2.204(a)(4)(iv).  "Because the power to seize evidence depends on the consent of the person form whom the evidence is to be taken, however, [such] parole officers lack the seizure power contemplated by section 2680(h)."  Wilson, 959 F.2d at 15.  The USPC Defendants do not even exercise those limited powers, because they do not have in-person contact with parolees; indeed, Ford does not allege that the USPC Defendants had any direct contact with him. To the extent that the USPC has face-to-face contact with a parolee like Ford,

that would occur only at a revocation hearing.  Consequently, Defendants Mitchell, Fulwood, Herman, Gobble, Kelley, and Jackson are not investigative or law enforcement officers within the meaning of the FTCA, and no intentional tort claim can be based on their conduct.  See id.; accord Moore v. United States, 213 F.3d 705, 708-09, 710 (D.C. Cir. 2000) (noting and affirming district court's conclusion that prosecutor was not investigative or law enforcement official for purposes of 2680(h)).

CSOSA supervision officers also lack the powers of federal law enforcement or investigative officers within the meaning of Section 2680(h).  As noted, to be deemed a law enforcement officer under the FTCA, an agency official must be authorized to execute searches, seize evidence, or make arrest for violations of Federal Law.  See 28 USC. § 2680(h).  CSOSA supervision officers do not have the authority to make arrests; they recommend that the USPC issue a warrant, see 28 CFR § 2.98, and forward the warrant to the U.S. Marshal's Office for execution after the USPC issues it.  See id. § 2.99.[3]  Therefore, like the USPC Defendants, the CSOSA employees whose conduct is at issue in this lawsuit cannot properly be deemed law enforcement or investigate officers for purposes of the intentional tort exception.  See Wilson, 959 F.2d at 15.

In sum, the tort claims set forth in Paragraphs 77-90 of the complaint all arise from the intentional torts of false arrest and false imprisonment, which fall within Section 2680(h)'s exemption.  The CSOSA and USPC employees identified in those tort claims are not law enforcement or investigative officers.  Consequently, the sovereign immunity of the United States bars those claims, and they should be dismissed for lack of jurisdiction.

---

[3]  In this case, Ford was arrested on July 26, 2004 by the Metropolitan Police Department for the parole violation.  See Am. Compl. ¶ 34.

**B.  The Discretionary Function Exception Bars The Tort Claims Premised On USPC Officials' Conduct.**

The discretionary function exception to the FTCA "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." Shuler v. United States, 531 F.3d 930, 933 (D.C. Cir. 2008) (internal quotation marks omitted).  The exception provides that agents and employees of the United States will not be held liable for their challenged conduct if performance of their duties necessarily involves making decisions that are grounded in public policy.  See Berkovitz v. United States, 486 U.S. 531, 536-37 (1988); Gaubert v. United States, 499 U.S. 315, 323 (1991).  It bars "any [FTCA] claim based on a discretionary function."  Gray v. Bell, 712 F.2d 490, 507 (D.C. Cir. 1983).  The purpose of the exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. S.A. Empresa de Viacao Aerea Rio Grandesse (Varig Airlines), 467 U.S. 797, 814 (1984).

The Supreme Court has established a two-part test to determine whether the discretionary function exception applies.  See United States v. Gaubert, 499 U.S. 315 (1991).  "First, the exception 'covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice." ' " Sloan v. U.S. Dept. of Housing and Urban Development, 236 F.3d 756. 759  (D.C. Cir. 2001) (quoting Gaubert, 499 U.S. at 322).  Secondly, even if judgment or choice is involved, it must be the kind that the discretionary function exception was designed to shield. Id. at 760 (citing Gaubert, 499 U.S. at 322-23).  If that exception applies, the district court lacks jurisdiction over the case.  Sloan, 236 F.3d at 759. As explained below, the claims alleging that USPC officials negligently requested and/or signed warrants for Ford's arrest, proposed

12

expedited revocation, and signed a certificate of supervised release (AM. Compl. ¶¶ 78-79, 82-85) challenge discretionary functions, and therefore must be dismissed for lack of jurisdiction.

The applicable regulations commit the allegedly tortious acts to USPC officials' discretion.  28 C.F.R. § 2.211(a) provides that "[i]f a releasee is alleged to have violated the conditions of his release, and satisfactory evidence thereof is presented, a Commissioner *may* . . . issue a warrant for the apprehension and return of the releasee to custody."  The use of the word "may" indicates that this is discretionary.   Thus, the decision to sign and thereby issue a warrant meets the first part of the discretionary function test.  See Lazo v. United States, 2007 WL 2948342, at *4 (S.D.N.Y. Oct. 9, 2007) (issuing warrant to arrest someone who violated terms of special parole is discretionary); Davis v. United States, 1987 WL 9416, at *1 (S.D. Tex. Mar. 31, 1987).  Like the investigatory acts that were at issue in Gray v. Bell, signing a request for a warrant is "not meaningfully separable" from the discretionary act of issuing a warrant.  Gray, 712 F.2d at 516. Thus it, too, is discretionary.

The remaining allegedly tortious acts (signing the supervised release certificate and proposing expedited revocation) fall within the USPC's discretion to revoke or extend parole and set the conditions for supervised release.  The USPC has "the same authority as is vested in the U.S. district courts by paragraphs (d) through (i) of 18 U.S.C. § 3583."  D.C. Code § 24-133(c)(2); see also 28 C.F.R. § 2.200(b).   18 U.S.C. § 3583, in turn, provides that courts and the USPC "*may* order. . . any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate."  18 U.S.C. § 3583(d)(3) (emphasis added).  It further states that courts and the UPSC "*may* . . . [after considering certain factors]. . . (2) extend a term of supervised release….[or] (3) revoke a term of supervised release."  Id. § 3583 (e).  Given that both statutory provisions use the permissive term "may," it

is clear that the USPC's authority to modify and/or set the terms of supervised release is discretionary in nature. See Wilson v. United States, 767 F. Supp.2d 551, (S.D.N.Y. 1991), aff'd 959 F.2d 12 (2d Cir.1992); Payton v. United States, 679 F.2d 475, 480-82 (5th Cir. 1982) (affirming dismissal of FTCA challenge to USPC's decision to release prisoner on parole and to adopt parole terms which did not require continued treatment or supervision because the USPC's allegedly tortious acts were within the discretionary function exemption).  Parole officers have "broad discretion" to determine which parole conditions are appropropriate, and whether a violation such as Ford's failure to report to his supervised release officer warrants revocation of parole. Morrissey v. Brewer, 408 U.S. 471, 479 (1972).

The USPC decisions at issue here all involve the type of policy judgment and choices that the discretionary function exemption was designed to cover. When the USPC decides whether to extend or revoke supervised release, and/or to request or issue an arrest warrant, its decisions implicate important political, social, and economic policies.  See Wilson, 767 F. Supp.2d at 552. "Determining when to arrest an individual concerns a policy judgment involving prosecutorial discretion in curbing criminal behavior." Shuler v. United States, 448 F. Supp.2d 13, 20 (D.D.C. 2006).  Like the decision whether to release an inmate on parole, supervised release determinations involves a "policy judgment" regarding the best way to rehabilitate an offender and restore him to a "normal and useful life within the boundaries of the law." Burger v. United States, 748 F. Supp. 1265, 1270 (S.D. Ohio 1990).  Deciding whether to issue an arrest warrant or initiate revocation proceedings "involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts." Morrissey, 408 U.S. at 480. The discretionary function exemption prevents such decisions from being "second-guessed" by courts. Burger, 748 F. Supp. 2d at 1270; see also id.

at 1276 (setting forth conclusions of law); <u>Wilson</u>, 767 F. Supp.2d at 552; <u>accord</u> <u>Shuler</u>, 448 F.

Supp.2d at 19 (concluding "the decision as to when to arrest a criminal suspect . . . constitute

decisions 'of the kind that the discretionary function exception was designed to shield'").

## II.   FORD'S SECTION 1983 CLAIMS AGAINST THE CSOSA DEFENDANTS FAIL BECAUSE THE CSOSA DEFENDANTS WERE ACTING UNDER COLOR OF FEDERAL LAW.

Ford's Section 1983 claims against the CSOSA Defendants should be dismissed because

the CSOSA Defendants are federal executive branch officials who acted pursuant to federal law.

Section 1983 claims generally apply to state officials acting under color of state law — not

against a defendant who acted under color of federal law at all relevant times.  Section 1983

provides :

> Every person who, *under color of any statute, ordinance, regulation, custom, or*
> *usage, of any State or Territory or the District of Columbia*, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges or immunities
> secured by the Constitution and laws, shall be liable to the person injured in an
> action at law, suit in equity, or other proper proceeding for redress, except that in
> any action brought against a judicial officer for an act or omission taken in such
> officer's judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was unavailable.  For the
> purposes of this section, any Act of Congress applicable exclusively to the
> District of Columbia shall be considered to be a statute of the District of
> Columbia.

42 U.S.C. § 1983 (emphasis added).  That statutory language clearly indicates that Section 1983

applies only to actions under color of the laws of the states, the District of Columbia, and federal

territories.  Thus, it is well settled that "[s]ection 1983 does not apply to federal officials acting

under color of federal law."[4]  <u>Settles v. United States Parole Comm'n</u>, 429 F.3d 1098, 1104

---

[4] The only possible exception occurs when there is a conspiracy between state and federal
officials resulting in an abuse of authority derived from state law.  <u>Kletschka v. Driver</u>, 411 F.2d
436, 448 (2d Cir. 1969).

(D.C. Cir. 2005); see also Williams v. United States of America, 396 F.3d 412, 414-16 (D.C. Cir.

2005); Daly-Murphy v. Winston, 837 F.2d 348, 355 (9th Cir. 1987);  McCord v. Bailey, 636

F.2d 606, 613 (D.C. Cir. 1980) ("Actions of federal officers are outside of [section 1983's]

proscriptions.").

Although CSOSA supervises District of Columbia offenders, and works with the District

of Columbia Superior Court, CSOSA employees are executive branch officials whose authority

to supervise D.C. offenders ultimately derives from federal law.  See Cooper v. Johnson, 652 F.

Supp. 2d 33, 38 (D.D.C. 2009).  CSOSA was created by President Clinton in 1997, and was

certified as an independent executive branch agency on August 5, 2001.  CSOSA receives

federal appropriations, and its director is appointed by the President.  See P.L. 111-117, 2009

H.R. 3288 (Dec. 16, 2009); 5 U.S.C. § 3345; 28 C.F.R. § 800.4(a).  Federal regulations govern

CSOSA's supervision and reporting practices.  See 28 C.F.R. §§ 800.1  et seq.  Consequently,

CSOSA officials act under color of federal law when they supervise prisoners.  See Cooper, 652

F. Supp. 2d at 39.

The CSOSA Defendants recognize that the D.C. Circuit has held that USPC officials who

supervise District of Columbia parolees under the National Capital Improvement and

Revitalization Act are state actors for purposes of Section 1983 claims seeking prospective

injunctive and declaratory relief.[5]  See Settles, 429 F.3d at 1104. Ford contends that CSOSA

officials are state actors because the Revitalization Act  applies only in the District of Columbia.

See Compl. ¶ 31.  However, the D.C.Circuit has not extended Settles to CSOSA employees.

The only precedent from this District addressing the issue indicates that Bivens v. Six Unknown

Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), is the sole means to bring

---

[5] The USPC Officials disagree with the Circuit's conclusion, and reserve the right to
challenge it at a later stage.

constitutional damages claims against CSOSA officials sued in their individual capacity.  See

Cooper, 652 F. Supp. 2d at 38; Ali v. D.C. Court Services, 538 F. Supp.2d 157, 162 n.3 (D.D.C.

2008).  Those decisions properly interpret the scope of Section 1983 liability, and the Section

1983 claims against the CSOSA Officials should, therefore, be dismissed.

In the alternative, if the Court concludes that the CSOSA Defendants are federal actors,

the Section 1983 claims should be dismissed for the reasons discussed in Part III, infra. The

precedent allowing Section 1983 claims to proceed against USPC officials involves claims for

declaratory and injunctive relief; damages claims against USPC officials based on those

officials' alleged violation of a person's constitutional rights arise solely under Bivens, if at all.[6]

## III.  FORD'S SECTION 1983 CLAIMS AGAINST THE USPC AND CSOSA DEFENDANTS SHOULD BE DISMISSED BECAUSE BIVENS PROVIDES THE ONLY MECHANISM FOR RECOVERING DAMAGES AGAINST FEDERAL OFFICIALS FOR ALLEGED CONSTITUTIONAL VIOLATIONS.

Ford appears to believe that Section 1983 provides a damages remedy for the USPC

Officials' alleged conduct because those officials act pursuant to the Revitalization Act, and have

been deemed to be state actors for purposes of certain Section 1983 claims. See Am. Compl.

¶ 41.  As noted, the Court has not addressed whether CSOSA officials are deemed to be state

actors in the context of Section 1983 claims, and the CSOSA Defendants contend that they are

federal actors.  But the law of this Circuit does permit plaintiffs to bring Section 1983 claims for

injunctive and declaratory relief against USPC officials in their official capacity, when those

officials act pursuant to the Revitalization Act.  See Anderson v. Reilly, 691 F. Supp.2d 89, 92

(D.D.C. 2010); Fletcher v. District of Columbia, 481 F. Supp.2d 156, 162 (D.D.C. 2007),

vacated in part on other grounds, 550 F. Supp.2d  30 (D.D.C. 2008).  The Court has not defined

---

[6]  The Defendants contend that the existence of the *habeas* remedy precludes the creation of a Bivens remedy in this case.  See  Part IV, infra. But in cases in which neither special factors nor an alternative remedial scheme foreclose a Bivens remedy, Bivens is the sole framework under which constitutional damages claims may be raised against federal officials in their individual capacity.

USPC officials as state actors for purposes of constitutional *damages* claims against federal officials in their *individual* capacity.  And CSOSA officials have not been defined as state actors for purposes of *any* Section 1983.  Therefore, constitutional damages claims against those officials arise solely under Bivens.

Fletcher v. District of Columbia is instructive.  District Judge Bates recognized that official capacity injunctive and declaratory relief claims may arise under Section 1983.  See Fletcher, 481 F. Supp.2d  at 162-63.  But the Court evaluated Fletcher's individual capacity claims for damages against the very same officials under the Bivens framework.  See id. at 164-65; see also Fletcher, 550 F. Supp.2d at 35, 37.  Similarly, in Anderson, Chief Judge Lamberth described Section 1983 liability as applying to official capacity claims for injunctive and declaratory relief, but did not state that individual capacity damages claims also arise under Section 1983.  See Anderson, 691 F. Supp. 2d at 92.

Simply stated, Bivens is the exclusive source of any potential constitutional damages remedy against federal officials sued in their individual capacities.  Given that Ford raises only individual-capacity damages claims, and does not seek injunctive or declaratory relief against the USPC or CSOSA Defendants in their official capacity,[7] he has no viable Section 1983 claim against those defendants.  The Section 1983 claims against the USPC and CSOSA Defendants should, therefore, be dismissed.

## IV.    NO BIVENS REMEDY SHOULD BE CREATED FOR FORD'S CLAIMS.

Ford cites Bivens as an alternative basis for seeking monetary damages from all of the defendants.  Am. Compl. ¶ 41. He contends that each Defendant took acts which led to his overdetention, thereby violating his Fourth and Fifth Amendment rights.  However, those claims

---

[7]  Any such claim would be moot, because Ford was released from supervision in 2009.

should be dismissed for failure to state a claim, because the existence of alternative remedies

under the habeas corpus laws and the Privacy Act counsels against the creation of a <u>Bivens</u>

remedy in these circumstances.  The analysis of the availability of a <u>Bivens</u> remedy --- which the

D.C. Circuit has referred to interchangeably as a "special factors" analysis and/or an inquiry into

whether alternative remedies preclude a <u>Bivens</u> remedy--- involves prudential concerns, and

therefore can be considered before jurisdictional defenses or any other defenses that are raised.

<u>Wilson v. Libby</u>, 498 F. Supp. 2d 74, 83 n.10 (D.D.C. 2007), <u>aff'd</u>  535 F.3d 697 (D.C. Cir.

2008).

     As summarized by the D.C. Circuit, courts generally should not be quick to recognize a

<u>Bivens</u> remedy, but especially not where Congress has enacted some form of statutory scheme

related to the conduct at issue:

> We have discretion in some circumstances to create a remedy against federal
> officials for constitutional violations, but we must decline to exercise that
> discretion where "special factors counsel[ ] hesitation" in doing so.  *See Bivens*,
> 403 U.S. at 396, 91 S. C. 1999; *Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C.
> Cir.1988) (*en banc*).  In *Bivens*, the Court implied a remedy where there were no
> "'special factors counseling hesitation in the absence of affirmative action by
> Congress'" that required "the judiciary [to] decline to exercise its discretion in
> favor of creating damages remedies against federal officials." *Spagnola*, 859 F.2d
> at 226 (quoting *Bivens*, 403 U.S. at 396, 91 S. C. 1999).  Since *Bivens*, the
> Supreme Court has "recognized two more nonstatutory damages remedies, the
> first for employment discrimination in violation of the Due Process Clause, *Davis
> v. Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979), and the
> second for an Eighth Amendment violation by prison officials, *Carlson v. Green*,
> 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980)," but "in most instances[,
> the Court has] found a *Bivens* remedy unjustified."  *Wilkie v. Robbins*, --- U.S. ---,
> 127 S. Ct. 2588, 2597, 168 L. Ed. 2d 389 (2007).  Indeed, in its "more recent
> decisions[, the Supreme Court has] responded cautiously to suggestions that
> *Bivens* remedies be extended into new contexts." *Chilicky*, 487 U.S. at 421, 108 S.
> Ct. 2460.

<u>Wilson v. Libby</u>, 535 F.3d 697, 705-06 (D.C. Cir.  2008).  One such "special factor" is the extent

to which Congress has created alternative remedies or "indications that congressional inaction

has not been inadvertent," id. at 706, typically in the form of statutory relief for related conduct, regardless of whether the relief provided appears likely to satisfy the plaintiff's demands in the given case.

Courts have declined to create an alternative Bivens-type remedy where a comprehensive statutory scheme has been established to provide relief in a given area.  See Mittleman v. U.S. Treasury, 773 F. Supp. 452, 454 (D.D.C. 1991) (Privacy Act bars plaintiff's constitutional claims); Weiss v. International Brotherhood of Electrical Workers, 729 F. Supp. 144, 147 (D.D.C. 1990) (to the extent that plaintiff's emotional injuries were the result of the stressful work situation created by the defendant, her claim of intentional infliction of emotional distress must be dismissed as subsumed within Title VII) (and cases cited therein); Spagnola v. Mathis, 859 F.2d 223, 229-30 (D.C. Cir. 1988) (en banc) (recognizing the exclusivity of the Civil Service Reform Act's remedies); see also Bush v. Lucas, 462 U.S. 367 (1983) (comprehensive procedural and substantive provisions of the Civil Service Reform Act constitute "special factors" counseling hesitation against a Bivens remedy); Schweiker v. Chilicky, 487 U.S. 412 (1988) (Social Security Disability Benefits Reform Act of 1984); see also Brown v. GSA, 425 U.S. 820 (1976) (Title VII is the sole remedy for federal employees complaining of job discrimination on account of sex or race); Gleason v. Malcomb, 718 F.2d 1044, 1048 (11th Cir. 1983) (special factors counsel against a Bivens remedy where Ford could have sought equitable relief pursuant to the Administrative Procedure Act ("APA")); Dearsman v. Kurtz, 516 F. Supp. 1255, 1259-60 (D.D.C. 1981) (Civil Service Reform Act ("CSRA") and Title VII constituted exclusive remedies for adverse actions and discrimination in the federal workplace, precluding Ford's due process claims).

The D.C. Circuit applies a three-step test to determine whether a <u>Bivens</u> remedy should be created, asking: (1) whether "Congress has put in place a comprehensive system to administer public rights;" (2) whether Congress "has not inadvertently omitted damages remedies for certain claimants;" and (3) whether Congress has "plainly expressed an intention that the Court preserve <u>Bivens</u> remedies." <u>Wilson</u>, 535 F.3d at 706. When conducting that analysis, the court exercises its judgment and "weigh[s] the reasons for and against the creation of a new cause of action." <u>Id.</u> at 710. "<u>Bivens</u> suits are reserved for cases where the plaintiff's remedy is 'damages or nothing.'" <u>Davis v. Passman</u>, 442 U.S. 228, 245 (1979).

Federal habeas corpus laws are a comprehensive statutory system which counsel against creating a <u>Bivens</u> remedy in this case. Those laws provide a remedy to any prisoner who challenges the computation of his or her sentence. <u>See</u> <u>Chatman-Bey v. Thornburgh</u>, 864 F.2d 804, 810-11 (D.C. Cir. 1988); <u>see also</u> <u>White v. Bowie</u>, 1999 WL 187769, at *1 (D.C. Cir. Mar. 2, 1999). Ford successfully pursued a <u>habeas</u> remedy. <u>See</u> <u>Ford</u>, 652 F. Supp.2d at 22. He should not be permitted to supplement that remedy by seeking damages against federal officials in a <u>Bivens</u> action.

When faced with a similar overdetention claim, this Court declined to create a <u>Bivens</u> remedy. <u>See</u> <u>Wormley v. United States</u>, 601 F. Supp.2d 27, 37-38 (D.D.C. 2009). Wormley alleged that she was mis-classified as being on escape, and subsequently incarcerated. She filed <u>Bivens</u> claims against federal officials, alleging that the over-detention violated her constitutional rights. The existence of a <u>habeas</u> remedy, and a potential Privacy Act remedy "buttressed forcefully by the Court of Appeals' and the Supreme Court's warnings against overextension of <u>Bivens</u> remedies, lead[] the Court to decide against creating a <u>Bivens</u> remedy for Ford's injuries." <u>Id.</u> at 37. The Court was "wary, for example, of establishing overdetention as an act for which

monetary damages are available from federal officials. This seems to be a situation where Congress might be better equipped to weigh the long-term effects of various possible remedial schemes and choose the best option." Id.  That analysis applies with equal force to this case.

To the extent that Ford's Bivens claims can be construed as challenging the fact that the USPC's and CSOSA's records generated or reviewed by the defendants indicated that Ford's supervised release ended in March, 2004, the Privacy Act counsels against recognizing a Bivens remedy for such a claim.  The D.C. Circuit has recognized that Bivens claims should not lie against federal officials for maintaining inaccurate records regarding prisioners, "because such claims are encompassed within the Privacy Act's comprehensive remedial scheme." (citing Chung v. United States Dep't of Justice, 333 F.3d 273, 274 (D.C. Cir. 2003)).  Chief Judge Lamberth also has cited the Privacy Act as a grounds for refusing to create a Bivens remedy based on inaccurate records that may lead to a prisoner's overdetention.  See Wormley, 601 F. Supp.2d at 37.

## V.   THE CSOSA AND USPC OFFICIALS ARE ABSOLUTELY IMMUNE FROM SUIT.

"Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." Pierson v. Ray, 386 U.S. 547, 553-54 (1967). The common law doctrine of judicial immunity has been endorsed by the Supreme Court for well over a century, and has been deemed necessary to preserve the independence and integrity of the judicial process. Bradley v. Fisher, 13 Wall. 335 (1872) (holding that a federal judge may not be assessed damages for a judicial act taken within his jurisdiction "however erroneous the act may have been, and however injurious"); see also Stump v. Sparkman, 435 U.S. 349, 363 (1978) (holding that judicial immunity applies regardless of a judge's procedural "informality" and despite any ex parte feature of the proceeding).

Courts have extended judicial immunity in the form of absolute "quasi-judicial" immunity for other federal officials close to the judicial process who play a role "'functionally comparable' to that of a judge," such as federal hearing examiners and administrative law judges. Butz v.Economou, 438 U.S. 478, 513 (1978). Courts have also extended absolute quasi-judicial immunity to a wide range of persons playing a role in the judicial process-including parole and probation officers.  See Nelson v. Williams, __ F. Supp.2d __, 2010 WL 4501767 (D.D.C. Nov. 9, 2010) (parole officers); Anderson v. Reilly, 691 F.Supp. 2d 89, 92 (D.D.C. 2010) (parole officers); see also Sellars v. Procunier, 641 F.2d 1295, 1303-04 (9th Cir. 1981) (holding that parole board members are entitled to absolute immunity); Briscoe v. LaHue, 460 U.S. 325, 335 (1983) (witnesses who testify in judicial proceedings); Imbler v. Pachtman, 424 U.S. 409, 424-26 (1976) (federal and state prosecutors, as well as grand jurors); Sindram v. Suda, 986 F.2d 1459, 1460 (D.C. Cir. 1993) (law clerks); Turner v. Barry, 856 F.2d 1539, 1541 (D.C. Cir. 1988) (probation officers); Simons v. Bellinger, 643 F.2d 774, 779-82 (D.C. Cir. 1980) (a court-appointed committee monitoring the unauthorized practice of law); Schinner v. Strathmann, 711 F.Supp. 1143 (D.D.C. 1989) (a psychiatrist who interviewed a criminal defendant to assist a trial judge).

This Court has repeatedly held that parole board officials are absolutely immune, noting that most federal courts have held that parole board members are absolutely immune, and anticipating that this Circuit will join sister circuits in so holding.  See Epps v. United States AG, 575 F. Supp. 2d 232, 242 (D.D.C. 2008) (dismissing plaintiff's complaint for failure to state a claim because a parole hearing officer and court services officer were entitled to absolute immunity); Pate v. United States, 277 F. Supp. 2d 1, 10-11 (D.D.C. 2003) (concluding that members of the Parole Board perform duties analogous to those of a judge when scheduling

parole revocation hearings); <u>Reynolds El v. Husk</u>, 273 F. Supp. 2d 11, 13 (D.D.C. 2002)

(concluding parole official was absolutely immune from suit challenging decision to deny

plaintiff's parole). <u>But see</u> <u>Johnson v. Williams</u>, 699 F. Supp.2d 159, 167-68 (D.D.C. 2010)

(concluding that absolute immunity did not extend to alleged errors in parole officials'

investigation of alleged parole violations).

Other federal courts have concluded that parole boards and parole officers are entitled to

quasi-judicial immunity with respect to their adjudicative functions. For example, in <u>Sellars</u>,

a prisoner sued a state parole board under 42 U.S.C. § 1983 alleging the parole board

conspired to deprive him of his civil rights by giving him an excessively late parole date. 641

F.2d at 1303-04. The Ninth Circuit found that parole board officials performed "functionally

comparable tasks to judges when they decided to grant, deny, or revoke parole" because they

"render[ed] impartial decisions in cases and controversies that excite strong feelings" and "face

the [] risk of constant unfounded suits by those disappointed in the parole board's decisions," and

as such the court held that they required quasi-judicial immunity.  <u>See</u> <u>id.</u> at 1302-03. Thus, the

court held "the adjudicatory system simply could not work" without absolute immunity because

the parole board's "already difficult task of balancing the risk involved in releasing a prisoner

whose rehabilitation is uncertain against the public's right to safety would become almost

impossible," and "[f]urthermore, time spent in depositions and on the witness stand defending

their actions would leave these overburdened public servants with even less time to perform their

crucial tasks." <u>Id.</u> at 1303; <u>see also</u> <u>Montero v. Travis</u>, 171 F.3d 757, 761 (2nd Cir. 1999)

(finding member of New York State Board of Parole was entitled to absolute immunity with

respect to the quasi-adjudicative function of revoking plaintiff's parole); <u>Anton v. Getty</u>, 78 F.3d

393, 396 (8th Cir. 1996) (finding that the Parole Commissioner and USPC officers were entitled

to absolute immunity with respect to the quasi-judicial function of determining that complainant failed to prepare an adequate release plan); Bermudez v. Duenas, 936 F.2d 1064, 1066 (9th Cir. 1991) (finding members of the Guam Territorial Parole Board were entitled to absolute immunity for actions taken when processing parole applications); Walter v. Torres, 917 F.2d 1379, 1383-84 (5th Cir. 1990) (finding the Texas Board of Pardons and Paroles entitled to absolute immunity in its application of rules to a particular case in the context of parole revocation procedure); Thompson v. Duke, 882 F.2d 1180, 1182-85 (7th Cir. 1989) (finding that members of the Prisoner Review Board and the Illinois Department of Corrections were subject to absolute immunity in the scheduling and conduct of a parole violation hearing, which is an integral judicial or quasi-judicial function), cert. denied, 495 U.S. 929 (1990); Johnson v. Rhode Island Parole Bd. Members, 815 F.2d 5, 6-8 (1st Cir. 1987) (holding that Rhode Island parole board members were shielded by absolute immunity in the performance of their official duties because they faced the risk of constant unfounded suits by those disappointed by their decisions, and without immunity there was danger that parole board members might not impartially adjudicate difficult cases).

Here, Plaintiff alleges that the CSOSA and USPC Officials are liable for acts taken in the very performance of their quasi-judicial duties.  Specifically, he contends that the officials' decision to revoke his parole, recommend revocation, and approve any such recommendation, violated his constitutional rights.  See Am. Compl. ¶¶ 41-70.  As the cases discussed supra demonstrate, all of the CSOSA and USPC Officials are entitled to absolute immunity because their alleged actions are quasi-judicial in nature, and functionally equivalent to the judgments that a judge makes when deciding whether to impose a sentence.  See Reynolds El, 273 F. Supp. 2d at 13. "The issuance of an arrest warrant has several key characteristics in common with a

judicial act: it involves the exercise of discretion in applying the law to the facts of a particular

case, poses a heightened risk of vexatious litigation, and is 'open to correction through ordinary

mechanisms or review.'" Walrath v. United States,, 35 F.3d 277, 282 (7th Cir. 1994).  That

immunity extends "to those activities that are part and parcel of the decision process." Sanders

v. Walker, 2010 WL 1979421 (N.D. Ill. May 17, 2010).  Therefore, the USPC Commissioners

who signed the warrants (Defendants Mitchell and Fulwood) and the USPC and CSOSA

employees whose alleged conduct was 'part and parcel' of that decision, are all absolutely

immune from suit.

## VI.  THE DOCTRINE OF QUALIFIED IMMUNITY ALSO SHIELDS THE CSOSA AND USPC DEFENDANTS FROM LIABILITY AND SUIT.

Individuals may bring a Bivens action for money damages against a federal official in his

or her individual capacity for violation of the individual's constitutional rights, provided that it is

appropriate to recognize a Bivens remedy in the circumstances.  42 U.S.C. § 1983 provides a

means to raise similar claims against state officials who act under color of state law.  See 42

U.S.C. § 1983.  But officials sued under Section 1983 or Bivens generally are entitled to a

defense of qualified immunity.  See Wilson v. Layne, 526 U.S. 603, 618 (1999) (citing Harlow,

357 U.S. at 818).  Qualified immunity "shields government officials from liability for civil

damages 'insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" Farmer v. Moritsugu, 163 F.3d 610,

613 (D.C. Cir. 1998) (citing Harlow, 357 U.S. at 818).

"[Q]ualified immunity provides not simply a defense to liability, but also 'an entitlement

not to stand trial or face the other burdens of litigation, conditioned on the resolution of the

essentially legal question whether the conduct of which Ford complains violated clearly

established law.'" Farmer,163 F.3d at 613 (citation omitted); see also Siegert v. Gilley, 500 U.S.

226, 232 (1991).  The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  Hunter v. Bryant, 474 U.S. 335, 341 (1986).  District courts should use the qualified immunity defense "expeditiously to weed out suits . . . without requiring a defendant who rightly claims qualified immunity to engage in expensive and time-consuming preparation to defend the suit on its merits."  Siegert, 500 U.S. at 232.

The qualified immunity doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law."  Hunter, 475 U.S. at 341.  The doctrine's protections apply "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).  If reasonable officials can disagree regarding the legality of the challenged conduct, the official is entitled to qualified immunity.  See Malley v. Briggs, 475 U.S. 335, 341 (1986); Wilson, 526 U.S. at 618 (noting that if courts "disagree on a constitutional question, it is unfair to subject [Bivens defendants] to money damages for picking the losing side of the controversy").  The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

In adjudicating a defense of qualified immunity, the court conducts a two-part inquiry which asks "whether the plaintiff has asserted a violation of a constitutional right at all," Siegert, 500 U.S. at 231, and assesses the "objective legal reasonableness" of the defendants' conduct in light of clearly established law.  Harlow, 457 U.S. at 818-19.  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first" in a given case.  Pearson, 129 S. Ct. at 919; see also Atherton v. District of Columbia Office of Mayor, 567 F.3d 672, 689 (D.C. Cir. 2009).

Qualified immunity applies here, because the CSOSA and USPC Defendants' alleged actions did not violate Ford's clearly established constitutional rights.  Although the February 17, 2004 warrant and the ensuing warrants were declared void at the conclusion of Ford's habeas proceeding, an objectively reasonable CSOSA and USPC official would not have predicted that outcome.  At the time the challenged decisions were made, it was reasonable for a USPC or CSOSA official to rely upon BOPs calculation of the sentence, and to conclude that the warrants, recommendations, and other challenged decisions were legitimate responses to Ford's conduct, and that Ford remained subject to the jurisdiction of the USPC and CSOSA.  Therefore, defendants' actions did not violate Ford's clearly established Fourth or Fifth Amendment rights.

**A. Ford's Allegations Do Not Demonstrate A Violation Of His Clearly Established Fourth Amendment Rights.**

**1. An Objectively Reasonable CSOSA Or USPC Official Would Believe That The Fourth Amendment Permitted Their Alleged Conduct.**

To defeat the qualified immunity defense, Ford must demonstrate that it would be 'obvious' to an objectively reasonable official that requesting and/or signing warrants, recommending  revocation of  Ford's parole, revoking his parole, or engaging in any of the other conduct at issue in the complaint violated Ford's Fourth Amendment right to be free from an "unlawful" seizure.  Ford neither denies that he engaged in the conduct on which those decisions were based (i.e., testing positive for illegal drugs, failing to report to meetings with probation officials, and otherwise failing to comply with the conditions of supervision), nor alleges that the misconduct (on Ford's part) that triggered the February 2004 warrant occurred after his period of supervised release ended.  Instead, he relies solely on the fact that the February 2004 warrant was

issued after his supervised release should have expired, because BOP officials miscalculated his detention period, thereby rendering it void and invalidating all subsequent periods of supervised release and incarceration. See Am. Compl. ¶¶ 44-53.

Until the habeas decision was issued in 2009, it was reasonable for CSOSA and USPC officials to believe that the Superior Court order indicating that Ford would be under supervised release for three months "upon release" meant that the three month period would begin to run on the date on which Ford was, in fact, released.  The federal regulations governing supervised release define the term of release in precisely that manner: "A period of supervised release that is subject to the Commission's jurisdiction begins to run on the day the offender is released from prison and continues to the expiration of the full term imposed by the Superior Court."  28 C.F.R. § 2.201(a).   Indeed, as Ford admits, he consented to many of the subsequent terms of supervised release and imprisonment.  See Am. Compl. ¶¶ 34-35.  Therefore, an objectively reasonable CSOSA or USPC official would have no reason to question, let alone doubt, the constitutionality of requesting and/or signing warrants, recommending revocation of  Ford's parole, revoking his parole, or engaging in any of the other conduct at issue in the complaint.

The Fourth Amendment protects individuals from "unreasonable seizures."  It provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  An arrest is not an "unreasonable seizure" for Fourth Amendment purposes, if it is made pursuant to a facially valid warrant, or if it is based upon probable cause.  See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); Hedgepeth v. Washington Metro. Area Transit Auth., 386 F.3d 1148, 1157, 1159 (D.C. Cir. 2004); Edwards v. Englehart, 648 F. Supp.2d 164, 167 (D.D.C. 2009).

The USPC and CSOSA Defendants are entitled to qualified immunity, because it would not be "apparent" to an objectively reasonable official in their position that requesting, signing, and approving the arrest warrants violated Ford's Fourth Amendment rights.  It is settled law that the sole responsibility for computing the sentences of prisoners within its jurisdiction rests with the Federal Bureau of Prisons ("BOP").  See United States v. Wilson, 503 U.S. 329, 395 (1992).  The July 24, 2003 Superior Court sentence indicated that Ford would be incarcerated for twelve months, with credit for time served, followed "upon release from imprisonment" by "three months supervised release."  See Exh. 1 (Superior Court sentence).  Ford was released December 17, 2003, which would lead any reasonable USPC or CSOSA official to conclude that Ford's three month supervised release term would run through March 16, 2004.  Even if those officials had reviewed the BOP sentence computation dated December 17, 2003, which indicated that "time had been served as of 1/24/03," see Exh. 2, that would make the end point of the supervised release term no earlier than February 23, 2004.  Ford does not deny that the incidents upon which the February 17, 2004 warrant was based --- including a failed drug test on January 5, 2004, a January 4, 2004 failure to report a change in residence, and repeated failures to report to CSOSA for supervision between December 17, 2003 and February 2004, see Exh. 3 --- occurred.  Consequently, at the time each USPC & CSOSA defendant took the actions Ford alleges violated his rights, BOP's official computation of Ford's sentence indicated that the February 17, 2004 warrant and all subsequent warrants and requests for warrants were timely and lawful.  An objectively reasonable official could be expected to rely upon BOP's release date, and/or the December 1, 2003 sentence computation data, and conclude that the February 17, 2004 warrant was valid.

Given that all of the subsequent arrests flowed from the same initial computation of Ford's supervised release term, it would be objectively reasonable for an official to conclude that any subsequent warrants and/or requests for warrants also were timely and valid.  As with the February 17, 2004 warrant, Ford does not dispute the accuracy of the USPC and CSOSA employees' descriptions and reports of Ford's conduct during the release periods; the subsequent warrants and incarceration were based upon a series of violations of the terms of Ford's supervised release.  See Ford, 652 F. Supp.2d at 12; Exh. 5.  A reasonable official would believe that those violations warranted modifying and/or revoking Ford's supervised release.  The fact that Ford consented to several of his subsequent periods of supervised release and incarceration ---- see Am. Compl. ¶¶ 34-35; Exh. 5 --- also would lead an objectively reasonable official to trust the validity of the ensuing warrants, arrest, and modifications to Ford's release; it would be reasonable to presume that Ford and/or his counsel would raise any miscalculation issues instead of consenting to further supervised release and detention.

Further, neither the USPC nor CSOSA Officials had the authority to modify the term of Ford's sentence.  See Ford, 652 F. Supp.2d at 19-20.  Therefore, even if the USPC and CSOSA Officials had believed that BOP had miscalculated that sentence, they would not be in a position to correct that error.  In sum, the officials' alleged conduct did not violate "clearly established" Fourth Amendment law because an objectively reasonable official would believe there was probable cause to issue warrants and to modify the terms of Ford's supervised release as a result of his parole violations.

The fact that the District Court later awarded *habeas* relief to Ford, and retroactively voided the February 17, 2004 warrant and subsequent warrants and parole revocation, does not strip the defendants of qualified immunity.  The qualified immunity inquiry turns on the

"objective legal reasonableness of the action, assessed in light of the legal rules that were clearly

established *at the time it was taken*." <u>Wilson</u>, 526 U.S. at 614 (emphasis added, internal

quotation marks omitted).  The fact that BOP had miscalculated Ford's 2003-2004 sentence, and

that the miscalculation rendered the intervening warrants and detention void, only became clear

in 2009 when the Court granted the *habeas* petition that Ford filed in 2007.  <u>See Ford</u>, 652 F.

Supp. 2d at 20-22.  All of the Defendants' challenged conduct predates that *habeas* ruling, and

Defendants cannot be expected to have anticipated that the sentence computation and warrants

that appeared facially valid at the time would later be voided.  In such situations, "[t]he fact that

the government agents acted on what *appeared to be* a facially valid warrant would be enough to

cloak them with qualified immunity." <u>Bailey v. United States Marshals Serv.</u>, 548 F. Supp.2d

128, 133 (D.D.C. 2008) (emphasis added).   As the Supreme Court recognized, "it is inevitable

that law enforcement officials will in some case reasonably but mistakenly conclude that

probable cause is present, and we have indicated that in such case those officials-like other

officials who act in ways they reasonably believe to be lawful-should not be held personally

liable." <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987); <u>see</u> <u>also</u> <u>Bailey</u>, 548 F. Supp.2d at

(quoting same).

Even if the USPC and CSOSA officials had possessed all of the documents that the Court

reviewed in the *habeas* proceeding at the time of their challenged conduct, it would not have

been apparent that Ford's release term expired before February 17, 2004.  There were no

documents that clearly proved that Ford had been in custody during his hospitalization.  <u>See</u>

<u>Ford</u>, 652 F. Supp.2d at 17-18.  The Court concluded that Ford was entitled to 'time served'

credit for that period because the United States could not rebut the presumption that Ford was in

custody during that time.  <u>See</u> <u>id.</u>  And none of the Superior Court documents that the Court

reviewed expressly stated that the three month supervised release period should begin before the date on which Ford was actually released; the District Court relied on handwritten notations on forms and the Court's own understanding of the intent underlying the Superior Court's sentencing order.  See id. at 19-21.

Indeed, even if the CSOSA and USPC Officials had known that BOP miscalculated the term of Ford's sentence, they could have reasonably believed that the miscalculation did not alter the term of Ford's supervised release.  See United States v. Johnson, 529 U.S. 53 (2000); Ford, 652 F. Supp. 2d at 20-21 (discussing the government's assertion that under Johnson, the time that BOP omitted from Ford's sentence cannot be applied to reduce Ford's supervised release).  At the time of Defendants' alleged conduct, precedent from other Circuits indicated that a miscalculation would not affect the term of Plaintiff's supervised release.  See, 214 Fed.Appx. 264, 266 (3rd Cir 2007) (term of supervised release "cannot be reduced by reason of excess time served in prison") (quotation marks and citation omitted); Pettit v. Lehman, 43 Fed.Appx. 8, 9 (9th Cir. 2002) ("extra" time spent in prison cannot be credited against remaining term of supervised release or financial obligation); Dildabanian v. Samuels, 2007 WL 1876490, *3 (D.N.J. June 26, 2007) ("the length of a term of supervised release cannot be reduced by reason of excess time served in prison") (quotation marks and citation omitted).   Although this Court held otherwise in the *habeas* case, qualified immunity still applies. See Malley v. Briggs, 475 U.S. 335, 341 (1986) (immunity applies where "officers of reasonable competence could disagree" on the legal issue).

In sum, before the *habeas* ruling, it simply was not clear that requesting or issuing a warrant for Ford's arrest as a parole violator would violate the Fourth Amendment or any other law.  As noted, a government official is entitled to qualified immunity "unless '[t]he contours of

the right [were] sufficiently clear that a reasonable official would [have] under[stood] that what he [was] doing violate[d] that right." <u>Farmer</u>, 163 F.3d at 613 (citation omitted).   Therefore, qualified immunity applies in this case.

### 2.   The CSOSA And BOP Defendants' Alleged Conduct Did Not Violate The Fourth Amendment.

The remaining step of the qualified immunity analysis asks whether the complaint alleges facts which establish that the officer's conduct violated the plaintiff's constitutional or statutory rights. <u>Siegert</u>, 500 U.S. at 231.  The Court need not reach this issue, if it determines that Defendants' alleged conduct did not violate "clearly established" law.  <u>See</u> <u>Pearson</u>, 129 S.Ct. at 819.   But if the Court chooses to reach this step of the qualified immunity analysis, it also should be resolved in favor of the CSOSA and USPC Defendants.  Defendants recognize that the February 17, 2004 warrants, and the subsequent warrants and requests for warrants have been voided.  <u>See</u> <u>Ford</u>, 652 F. Supp.2d at 22.  Consequently, Ford was not arrested pursuant to a valid warrant.   However, the CSOSA and USPC Defendants' alleged actions were constitutional, because they were based on a reasonable belief that Ford was on supervised release through February 17, 2004, and because Ford's conduct prior to February 17, 2004 (and the later conduct that gave rise to later warrants) was well documented and provided a basis to conclude that a warrant was appropriate.

It bears noting that none of the defendants actually arrested or detained Ford pursuant to the warrant.  The 'unlawful seizures' of which they are accused are, in fact, a series of actions which, combined with Ford's conduct, ultimately led to Ford's arrest, modification of his parole, and/or his subsequent incarceration --- <u>i.e.</u>, requesting a warrant, signing a warrant, and approving a request for a warrant.  <u>See</u> Am. Compl. ¶ 43.  Ford's characterization of those actions as a 'seizure' is questionable, at best.  In any event, Ford's own undisputed conduct ---

34

failing to report to parole officers, failing a drug test, and committing other infractions --- gave

the USPC and CSOSA officials probable cause to request, sign, and or approve the request for a

warrant. It follows that the USPC and CSOSA Defendants' alleged conduct did not violate

Ford's Fourth Amendment rights.

**B. Ford's Allegations Do Not Demonstrate A Violation Of His Clearly Established Fifth Amendment Rights.**

Ford also contends that the USPC and CSOSA Defendants' actions deprived him of a

Fifth Amendment liberty interest. See Am. Compl. ¶ 57. The qualified immunity doctrine

requires the dismissal of those claims. The CSOSA and USPC Officials' alleged conduct did not

violate Ford's Fifth Amendment rights (assuming that the Fifth Amendment even applies in this

context). And even if the complaint stated a violation of Ford's due process rights, a reasonable

official would not have known that his or her actions would lead to the unlawful detention of

Ford.

There is conflict among the circuits regarding whether overdetention implicates the Fifth

Amendment or the Eighth Amendment. See Lemarr v. Doe, No. 05-167, 2008 WL 2078159, at

*4 (S.D. Tex. May 15. 2008) (citing cases); Compare, e.g., Moore v. Tartler, 986 F.2d 682, 687

(3d Cir. 1993) (concluding that detaining prisoner for three months beyond expiration of his term

potentially violated the Eighth Amendment); Haygood v. Younger, 769 F.2d 1350 (9th Cir.

1985) (same) with Barnes v. District of Columbia, 242 F.R.D. 113, 117 (D.D.C. 2007) (citing

Seventh and Eleventh Circuit cases for premise that overdetention can violate an inmate's Fifth

Amendment rights). Further, if Ford has a cognizable Fourth Amendment claim based on his

overdetention, he cannot also pursue a substantive due process claim under the Fifth

Amendment. See Rice v. District of Columbia, 715 F. Supp.2d 127 (D.D.C. 2010) ("If a

constitutional claim is covered by a specific constitutional provision, such as the Fourth or

Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific

provision, not under the rubric of substantive due process") (quoting United States v. Lanier, 520

U.S. 258, 272 n.7 (1997).   Given the unsettled nature of the caselaw, and the lack of any D.C.

Circuit ruling on the issue, it would not be apparent to a reasonable CSOSA or USPC official

that taking actions that contributed to Ford's overdetention might abridge Ford's Fifth

Amendment liberty interests.

 Courts reviewing overdetention claims under the Eighth and Fifth Amendment impose a

stringent standard which requires the plaintiff to show that officials acted with deliberate

indifference to the prisoner's interest.  See Mortimer v. Baca, 594 F.3d 714, 722 (9th Cir. 2010)

(applying deliberate indifference standard in Eighth Amendment overdetention case); West v.

Tillman, 496 F.3d 1321, 1327 (11th Cir. 2007) (applying deliberate indifference standard to

prisoner's due process claims); Monroe v. Fletcher, No. 7:05-cv-288, 2007 WL  853771, at *2

(W.D. Va. Mar. 16, 2007) (noting that deliberate indifference standard applies to both Fifth and

Eighth Amendment claims); see generally County of Sacramento v. Lewis, 523 U.S. 833, 847

(1998) (concluding that substantive due process violation occurs only when executive branch

officials' conduct "can properly be characterized as arbitrary, or conscious shocking, in a

constitutional sense").  Deliberate indifference "entails something more than negligence," and

requires conduct akin to "recklessness." Wormley, 601 F. Supp.2d at 41.   "Human error does

not equal deliberate indifference. Plaintiffs must show that Defendants had '(1) subjective

knowledge of a risk of serious harm; [and] (2) disregard[ed] ... that risk; (3) by conduct that is

more than mere negligence.'" West, 496 F.3d at 1327.

Ford's conclusory allegation that the defendants "knew or should have known" that BOP had miscalculated his sentence based on overcrowding conditions is not sufficient to demonstrate that the CSOSA and USPC Officials were deliberately indifferent to the term of his supervised release, and to their authority to recommend, approve, or sign parole revocation warrants. Instead, the information that a reasonable official would have had at the time indicated that the CSOSA and USPC Officials' conduct was reasonable: the Superior Court order indicated that Ford would serve three months of supervised release "upon his release;" Ford was released less than three months before the February 17, 2004 warrant was issued; contemporaneous BOP records indicated that Ford's term expired no earlier than November 24, 2003 (which was less than three months before the February 17, 2004 warrant was issued); Ford consented to his subsequent supervised release and incarceration; and Ford does not claim to have given the USPC or CSOSA  Officials any documents indicating that he should have been released before November 17, 2003.  Assuming the truth of Ford's allegations, the USPC and CSOSA Officials cannot be said to have acted recklessly.  Therefore, the complaint does not establish that a violation of Ford's Fifth or Eighth Amendment rights (if the complaint were construed to incorporate an Eighth Amendment theory of liability) occurred.  See generally Wood v. Warachek, 618 F.2d 1225, 1231 (7th Cir. 1980) (concluding that "a jailer [who illegally detains an inmate] cannot be found liable where he has acted reasonably and in good faith" and the errors that led to the illegal detention "take place beyond the scope of his responsibility").

Even if Defendants' alleged actions did constitute a violation of Ford's Fifth Amendment rights, qualified immunity would apply.  For the reasons articulated above, a reasonable CSOSA official would not have known that the February 17, 2004 warrant was issued after Ford's supervised release expired, and therefore would not have known that requesting, issuing, and/or

37

approving that warrant and subsequent warrants would lead to Ford's overdetention.  <u>See</u>

<u>Wormley</u>, 601 F. Supp.2d at 39-40 (concluding qualified immunity protected officials from Fifth

Amendment overdetention claim because "it cannot be said that reasonable officers" in the

defendants' position "would have known that their actions would lead to plaintiff's

overdetention").

**<u>CONCLUSION</u>**

For the foregoing reasons, the United States of America requests that the claims against it

be DISMISSED in part, and the USPC and CSOSA Defendants request that the claims against

them be DISMISSED in their entirety.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

RUDOLPH CONTRERAS, DC BAR # 434122
Chief, Civil Division

BY:      /s/   *Robin Meriweather*

ROBIN M. MERIWEATHER
DC BAR # 490114
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7198 (202) 514-8780 (fax)
Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEVIN C. FORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 10-cv-1517 (RLW) |
| | ) |
| | ) |
| | ) |
| CRANSTON MITCHELL | ) |
| PAROLE COMMISSIONER | ) |
| UNITED STATES PAROLE COMMISSION | ) |
| et al., | ) |
| Defendants. | ) |

**PROPOSED ORDER**

Upon consideration of Defendants' motion to dismiss, it is this ___ day of

_____,

ORDERED that the claims against Defendants Cranston Mitchell, Isaac Fulwood, Saher Khan,

Helen Herman, Lori Gobble, Joann Kelley, Jequan Jackson, Jessica Stigall, and Verna Young, be

and hereby are DISMISSED for failure to state a claim.  It is further ORDERED that all tort

claims arising out of the alleged acts or omissions of Defendants Cranston Mitchell, Isaac

Fulwood, Saher Khan, Helen Herman, Lori Gobble, Joann Kelley, Jequan Jackson, Jessica

Stigall, and Verna Young, be and hereby are DISMISSED for lack of jurisdiction.  The attached

Memorandum Opinion sets forth the Court's reasoning.

SO ORDERED.

_____
United States District Judge